**People of the State of Illinois, Plaintiff-Appellee, v. Ozean Davis, Defendant-Appellant.**

**Gen. No. 64–76.**

Fifth District

December 8, 1966.

Harold M. Jennings, of Belleville, for appellant.

Michael P. O'Shea, State's Attorney of Alexander County, of Cairo, for appellee.

MORAN, J.

Defendant was tried by the court without a jury in the Circuit Court of Alexander County, and found guilty of an

attempt to murder Charles Williams. He was sentenced to a minimum of 10 years and a maximum of 20 years in the penitentiary. He contends in this appeal that there was insufficient evidence to support the finding of the trial court.

Charles Williams, a police officer of Cairo, Illinois, was shot with his service revolver while attempting to put the defendant in his police car after a traffic arrest. He testified that the defendant, without his knowledge, took his gun from his holster and shot him while he was attempting to push the defendant into the police car. The defendant testified that the officer was shot accidentally when he grabbed the officer's wrist after the officer had pulled the gun from the holster.

Williams testified that he was on patrol duty on October 29, 1962, working the 4 to 12 p. m. shift, when he learned that a car was being driven toward Cairo, Illinois, in an erratic manner. He parked his patrol car at 38th and Sycamore Streets to watch for cars coming in from the north end of town. While there, he spotted what he thought was the car that he was watching for and followed it south on Sycamore to the middle of the 3100 block of Sycamore, where he pulled it over to the curb and parked about three to five feet behind it. He radioed the police station that he had located the car and then walked to the driver's side of the car and asked the driver for his driver's license. The driver's license disclosed that the car was being driven by the defendant, Ozean Davis, but Officer Williams did not know Davis before that time.

Davis stepped from the car at Officer Williams' request. Williams then testified:

> I asked subject Davis to walk back to my patrol car, approximately halfway, and then turn around and walk back, and at this time he walked back to my patrol car and when he got approximately half-

way, I asked him to turn around right quick. When I asked him to do this he turned around and lost his balance and fell up against the patrol car. This took place on the east side of the car. He fell against the car, caught his balance, straightened back up and walked back towards his car where I was standing. I then proceeded back toward the patrol car and met him at the space between the two cars where they were parked and advised him that he was under arrest for reckless driving while under the influence.

I then told Davis to walk around to the side of the police car with me which would be the west side of the car. That would be on the sidewalk side and I opened the door of the car and invited him to put his hands on the car. He did so without argument or anything; put his hands on the side of the car and I searched him for any weapons. Finding none, I told him to turn around and have a seat in the car. At this time he turned around and was standing right by the seat of the car and started to walk between me and the door and I advised him to go ahead and get in the car and he said he wanted to see his wife. I told him I would talk to his wife and tell her what the circumstances were and why he was being arrested. And he also argued about his driver's license. He wanted his driver's license back. I told him at that time that his driver's license would be returned to him at the proper time. At this time, while the subject tried to push me around again and I placed both of my hands upon his shoulders. He was standing backward to the car and I attempted to force him down to the seat of the car. The subject kept resisting and grabbed hold of the car door and pulled on it and kept trying to push me back. Then I felt him push against my chest. At that time I heard a shot and felt pain.

456

After the officer had placed his hands on Davis' shoulders, he heard the sound which was an exploding gun and he felt pain which hurtled him backwards from the car to the ground; he was shot in the left side, right at the belt line. He twisted around and reached back to his holster for his revolver. He knew the defendant had shot him and he reached back and found that his revolver was not in the holster; he felt around for it but was unable to find it. "The thing had fell on the ground and I felt around on the ground for it and was unable to locate it."

Defendant, Ozean Davis, testified:

> Well, he come to the door and he (Williams) asked me out and I got out and he searched me and asked me for my driver's license. That's what he asked for —he searched me and then he asked me if I had been drinking. I told him yes, and then he asked me to walk from about the left front door of my car to about the left back door of his car and turn around and walk back, facing him, and I did that. Then he asked me to walk to the right door of his car. I start off doing that and that is when he shoved me between the back bumper of my car and the front bumper of his car and he give me a shove and I asked him what he was going to do with me and he said I was under arrest and I said, "What?" and he said, "Reckless driving," and I said, "Well, could I tell my sister to trail us wherever you're taking us to." He called me a "black son of a bitchin' nigger" and kicked me twice and I got a scar here on my left leg.

Continuing, he said:

> Then he pulled his gun out and I grabbed the gun. I was afraid he was going to shoot me. When he pulled his gun out I grabbed his arm and twisted it around to keep him from shooting me. I was scared. The gun automatically discharged and when it dis-

457

charged, the officer fell and I got fear and I become panic and run off and got in my car and pulled off. I drive off. Marvin or Roychester asked me what happened, some of them, but I don't remember what it was, I was too frightened. Later on I was chased by some police cars. I did not have the gun in my hand at the time it went off. I was tussling with Officer Williams for control of the gun when it went off. I never at any time had any intention of shooting Officer Williams.

Officer Williams denied pushing or kicking Davis in the leg, denied calling him names and denied reaching for his gun. He said that his pistol was in the holster and that there was a snap on the holster. He did not recall when the gun was taken from his holster; he did not feel it being removed from his holster; the gun was fairly heavy and had a heavy frame. He admitted that if defendant Davis had taken the gun, it would have been necessary for Davis to first unsnap the holster, and then take the gun from the holster which was on the officer's right side. He testified that he was 5'8" tall and weighed 220 pounds at that time and estimated Davis' height at 5'6" to 5'8" and weight at about 175 pounds. The bullet hit the cartridge case, which was on the front part of his belt, and tore the cartridge case open. The bullet was deflected by the cartridges in the cartridge case. There was a hole through his belt, so it was concluded that the bullet went from the cartridge case, through the belt and into his body. Williams denied that he and Davis were scuffling for control of the gun at the time the gun went off.

Ira Sperr, on behalf of the State, testified that she resided at 416 Thirty-second Street, just west of Sycamore Street in Cairo; that she was at home around seven o'clock in the evening of October 29, 1962, when she heard the siren of the police car and ran to the door to see what

458

had happened. Her residence is the second house from a barbecue stand on the corner of Sycamore and 32nd Streets. She saw the policeman get out of the patrol car and go up to the other car. Then she saw "this fellow" get out of the car and the policeman stood there and talked with him for a few minutes. The fellow handed the officer something which she supposed to be his driver's license. She testified that they stood and talked a bit and then walked between the cars to the side door of the patrol car and stood there talking. While they were talking some children went by. She testified that the policeman was trying to get the man into the patrol car and she could see hands and arms moving; that the car door was open, and the policeman was standing by the car door and "this other fellow hauled loose and hit him" with his left hand and called him a "son of a bitch." She heard a shot and the policeman fell to the ground.

On cross-examination Mrs. Sperr testified that she did not know who called who a "son of a bitch"; that she just heard the name called and saw hands moving. She did not see Officer Williams search Davis, nor see Officer Williams push Davis and put his hands on Davis' shoulders.

Mike Betts, fourteen years of age, and Ronald Clark, thirteen years of age, on behalf of the State, testified that they saw the police car stop in the middle of the 3100 block of Sycamore Street, heard Davis tell the policeman that he wanted to tell his wife where he was going and heard the policeman say that he would tell Davis' wife where Davis was going. They saw the police officer try to push Davis into the patrol car, heard a shot and saw the policeman fall to the ground. They did not see the shot fired.

Roychester Williams, on behalf of the defendant, testified that he was seated in the right front seat of the car driven by the defendant; that Veatrice Wilson was seated in the front between him and Davis, and Myrtle Griffin,

459

Frazier Griffin, Marvin Griffin and Tomella Griffin were seated in the back seat of the car. Davis gave the police officer his driver's license and admitted that he had had something to drink but denied being drunk. The officer told Davis to walk from the left front door of Davis' car to the rear of the police car and while Davis was walking, the officer kept saying, "Faster, faster." Davis walked faster, back toward the police car. The officer then told Davis to walk between the two cars and when he did, the officer shoved him between the two cars. He testified that right after this, he heard Marvin Griffin shout to his mother that the policeman was about to shoot Ozean. He didn't know what happened after that. A minute or two later, Davis came back, jumped in the car and drove away at a high rate of speed, without saying anything to anyone. Shortly thereafter, Davis ran the car into a telephone pole and they were then apprehended.

Myrtle Griffin, a sister of Ozean Davis, testified on behalf of the defendant that she was in the back seat of the car when the officer stopped Ozean Davis and asked him for his driver's license. Davis gave the officer his license and the officer told Davis to stick his hands up on the side of the car. The officer searched him down, "patted him down," and then told him to walk from the back of Davis' car to the back of the patrol car, "and told him after he got to the back of his car, he told him, Ozean, to walk faster back to him and he came back fast, and then turned around, and he said 'walk on the other side, on the right side.' He made him walk between the two cars and at that time he shoved him. I was looking from the left side to where I was sitting in the car and just about as Marvin, he had the back side of the glass wiped off in the car, said 'The cop's fixin' to shoot Uncle Ozean. Look, mother,' and I was trying to turn around. I was trying to turn around, but my operation, I was so sore and stiff I couldn't turn around fast and when I did get a chance to turn around and look, Ozean was running back to the

460

car." Davis got back into the car and drove off at a high rate of speed without saying anything.

Marvin Griffin, sixteen years of age, a nephew of Ozean Davis and the son of Myrtle Griffin, testified on behalf of the defendant that he was in the back seat of the car when he saw the officer push Davis and tell him to get in the police car; that after the officer pushed Davis, the officer jumped back and kicked him; that Ozean fell back and the officer reached for his gun with his right hand and Ozean grabbed his wrist; that they started tussling and a little later Ozean came back, got into the car and drove away at a high rate of speed; that he saw all of this out of the back window of the car.

In People v. Dawson, 22 Ill2d 260 at 264, 265, 174 NE2d 817, our Supreme Court said:

> The finding of the trial judge as to the credibility of the witnesses is entitled to great weight. However, we cannot, in every case, accept the trial judge's finding as conclusive, for the rule is that it is the duty of this court to examine the evidence in a criminal case and if it is so unsatisfactory and unreasonable as to raise a serious doubt of defendant's guilt, the conviction must be reversed. (People v. Williams, 414 Ill 414; People v. Bucholz, 363 Ill 270.) The burden is always upon the State to prove the defendant guilty beyond a reasonable doubt and a judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of defendant's guilt. Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction.

Since Charles Williams was the only witness on behalf of the prosecution who testified as to how he was shot, the State's case must stand or fall on his testimony. In order to affirm this case, we must believe that Charles Williams

461

was pushing the defendant Davis into the police car with both of his hands on the defendant's shoulders, and that while the defendant had one hand on the door of the police car, the defendant, without Williams' knowledge, unsnapped the catch on Officer Williams' holster, removed the gun without Officer Williams' knowledge, and then shot him. How all this could happen, completely unnoticed and without warning to Officer Williams, is difficult to explain.

We find that the evidence upon which this conviction is based is so unsatisfactory and unreasonable that it raises a serious doubt of defendant's guilt of an assault with intent to commit murder, which must be proved as charged beyond a reasonable doubt. For the foregoing reasons this case is reversed.

Judgment reversed.

EBERSPACHER and GOLDENHERSH, JJ., concur.